# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI
# CENTRAL DIVISION

| | |
|---|---|
| BERKLEY INSURANCE COMPANY, and BERKLEY REGIONAL INSURANCE COMPANY, | )<br>)<br>)<br>) |
| Plaintiffs, | ) No. 2:16-cv-04136-NKL<br>)<br>) |
| v. | )<br>) |
| HAWTHORN BANK, | )<br>) |
| Defendant. | ) |

## ORDER

Plaintiffs Berkley Insurance and Berkley Regional Insurance are surety companies[1] that issued payment and performance bonds on behalf of Jefferson City Industries (JCI), a construction contractor. Berkley entered into an Indemnity Agreement with JCI, requiring JCI to repay Berkley if Berkley had to pay on the bonds. Defendant Hawthorn Bank was JCI's bank, and made loans to JCI.

JCI began having financial difficulties. After JCI failed to pay subcontractors and suppliers, or finish construction projects, Berkley paid claims under the bonds. Prior to that time, to satisfy some of JCI's unpaid loan debts due to Hawthorn Bank, Hawthorn Bank applied funds from JCI's accounts, including some progress payments that JCI received for its work on bonded contracts.

In this lawsuit, Berkley alleges that it is entitled to recover, from Hawthorn, the amount of the progress payments received by JCI, deposited into JCI's bank account, and then applied by Hawthorn to JCI's loan debts. Hawthorn moves for summary judgment. Doc. 38. Having

---

[1] The Plaintiffs will be referred to collectively as "Berkley."

considered the briefing and exhibits, and the oral arguments presented by the parties, the motion is granted.

## I. Background[2]

Berkley is a surety company and in the business of issuing surety bonds to contractors. Among other types of banking activities, Hawthorn Bank provides financial lending services to contractors.

In February 2013, Berkley and non-parties Jefferson City Industries (JCI), United HRB General Contractors, Jeff-Cole Holdings, Raidan Equipment, Anthony R. Adrian, and Onnimaria Adrian (collectively, Indemnitors) entered into a General Agreement of Indemnity related to any bonds that Berkley may issue to JCI. The Agreement provided for the assignment of bonds and contracts, and granted Berkley a general lien and continuing security interest in the Indemnitors' collateral, which included contracts, subcontracts, accounts, machinery and equipment, general intangibles, inventory, etc. The Agreement also provided that any funds due under any contract covered by a bond were trust funds. Berkley did not file UCC statements regarding the Agreement. Hawthorn Bank was not a party to the Agreement.

Berkley subsequently issued, as surety, payment and performance bonds with effective dates ranging from February 2013 to August 2014 for 20 mid-Missouri construction projects on behalf of JCI as bond principal. Despite receiving payments from obligees, JCI failed to pay numerous subcontractors and suppliers.

Hawthorn Bank provided financial lending services to JCI and filed UCC financing statements with the Missouri Secretary of State. JCI received progress payments on its contract work and deposited payments in its Hawthorn Bank, direct deposit accounts. Hawthorn applied some progress payments to the loan obligations that JCI owed Hawthorn.

---

[2] The facts set out are those which are supported and not genuinely disputed.

On January 20, 2015, Hawthorn received Berkley's written demand for "possession of" progress payments, along with a copy of the General Agreement of Indemnity.

On January 7, 2015 and February 5, 2015, Berkley sent correspondence to JCI vendors and subcontractors in which Berkley acknowledged its receipt of their proofs of claim, stating that the vendors and subcontractors would be contacted in due course regarding Berkley's investigation of their allegations, and stating that "this letter…should not be construed as an admission of liability or a promise to pay[.]" Doc. 39-2. Hawthorn Bank was not copied on or referenced in the correspondence. Berkley made its first payment under a payment or performance bond on February 10, 2015.

Berkley alleges that as JCI's surety, it has incurred losses in excess of $2,500,000 in paying for completion of the work, and resolving claims of the bonded project owners and obligees, and unpaid subcontractors and suppliers.

## II. Discussion

Berkley sues Hawthorn Bank under six counts: conversion, tortious interference with business expectancy, equitable lien, constructive trust, implied indemnity, and unjust enrichment. Doc. 11, pp. 18-26. For the reasons discussed below, Hawthorn is entitled to summary judgment on all counts.

### A. Evidentiary matters

The Court will address two evidentiary matters before addressing each of the counts.

#### 1. The date of the last progress payment applied to a JCI loan by Hawthorn

Hawthorn states that January 16, 2015 was the date that the last progress payment from any of the 20 project owners was deposited into a JCI direct deposit account by JCI, or applied to a JCI loan by Hawthorn. Doc. 39, p. 6 of 23 (Hawthorn's Statements of Fact, para. 6, citing Doc. 39-1, Affidavit of Jason Schwartz, Senior Vice President of Hawthorn Bank, p. 2).

Berkley "object[s]" to Hawthorn's Statement of Fact, para. 6, Doc. 42, p. 3 (citing Doc. 43-2, Exhibit A-4, Schwartz deposition), and argues that the Court should defer ruling on this issue because of a discovery dispute. First, Berkley has not shown good cause for failing to timely raise the discovery dispute, as required under the Scheduling Order, Doc. 17, p. 2 (requiring discovery motions to be filed by 3/22/2017, and discovery disputes to be resolved by 4/21/2017). *See* Fed. R. Civ. P. 16(b)(4) (modification of scheduling order requires a showing of good cause and the court's consent). Nor did Berkley file an affidavit showing why it could not "present facts essential to justify its opposition," as required under Fed. R. Civ. P. 56(d). *See Willmar Poultry Co. v. Morton-Norwich Prod., Inc.*, 520 F.2d 289, 297 (8th Cir. 1975). The Court will not defer ruling.

Second, Berkley's exhibits do not show that any progress payments were deposited into JCI's accounts after January 16, 2015 or applied to a JCI loan by Hawthorn after that date. While Berkley submits in its Statement of Additional Material Facts, para. 35, that after January 16, 2015, Hawthorn used "indemnitors' funds" to pay down debts they owed to Hawthorn, it cites no evidence to support that statement. Specifically, Berkley's evidence does not distinguish between the indemnitors' funds from contract owners on the bonded projects which are the funds relevant to this lawsuit, and funds that Hawthorn recovered from a Small Business Administration guaranty or other collateral which are not. *See also* Doc. 46-3, Deposition of Ellen Cavallaro, Berkley's corporate representative, p. 6 of 17 (testifying that Berkley sought only to recover proceeds from JCI's bonded contracts and not, for example, proceeds paid over from the Small Business Administration loans). Thus, whether some unspecified indemnitor funds were applied to a loan after January 16, 2015, Berkley has failed to genuinely dispute, by "citing to particular parts of materials in the record," Fed. R. Civ. P. 56(c)(1)(A), Jason Schwartz's statement that January 16, 2015 was the date that the last progress payment from any

of the 20 project owners was applied to a JCI loan by Hawthorn.

### 2. Hawthorn's knowledge of the Indemnity Agreement

Hawthorn states that it did not have actual knowledge of the Indemnity Agreement until receiving it on January 20, 2015. Doc. 39, p. 6 of 23, para. 13 (citing Doc. 39-1, Schwartz Affidavit, p. 3). The statement is not genuinely disputed, for the reasons discussed below.

Berkley states that Hawthorn's Statement of Fact, para. 13, is controverted because Hawthorn may be charged with "constructive knowledge" that the contracts were bonded and that the surety had an equitable right of subrogation upon the contractor's default. Doc. 44, p. 5 (citing *First State Bank v. Reorganized Sch. Dist. R-3, Bunker*, 495 S.W.2d 471, 478 (Mo. App. 1973), and Hawthorn's UCC filings, including an attached construction contract that by its terms required payment and performance bonds). "Constructive knowledge" is not a matter of fact but a matter of law, and the parties' legal arguments about equitable subrogation, *First State Bank*, and UCC filings are addressed in Section II.B.1.-.2, below. Furthermore, whether Hawthorn had any sort of knowledge that the contracts were bonded does not address Hawthorn's knowledge of the Indemnity Agreement or its contents, including the trust provision.

### B.  Count I, Conversion

"Conversion is the unauthorized assumption of the right of ownership over the personal property of another to the exclusion of the owner's rights." *Herron v. Barnard*, 390 S.W.3d 901, 908–09 (Mo. App. 2013) (citation omitted). To establish conversion, a plaintiff must show that: (1) it owned the property or was entitled to possess it; (2) the defendant took possession of the property with the intent to exercise some control over it; and (3) the defendant thereby deprived the plaintiff of the right to possession. *Id.* Berkley alleges that it was entitled to possession of the progress payments "through contract assignment and equitable subrogation," and that the funds represented constructive "trust funds." Doc. 1, pp. 18-19. The conversion

5

claim fails because Berkley cannot establish the first element, right of possession.

### 1. Contract assignment

Berkley's claim to a security interest in the contract proceeds is subject to the same UCC filing requirements as Hawthorn Bank's claim to a security interest in the contract's proceeds. *See* Mo. § 400.9-310(a) (requiring a financing statement to be filed to perfect security interests); *see also In re Kuhn Const. Co., Inc.*, 11 B.R. 746, 749 (S.D. W.Va. Bankr. 1981) (holding that "a surety must conform to the Article 9 filing requirements to perfect a consensual security interest in any funds due or to become due to [the contractor] under its construction contracts") (citing *In re. J.V. Gleason Co.,* 452 F.2d 1219 (8th Cir. 1971)). Hawthorn Bank perfected its security interest in the proceeds by filing a UCC statement. Berkley did not file such statements. Therefore, Berkley had no superior right of possession through contract assignment.

However, as Berkley argues and Hawthorn Bank does not dispute, equitable subrogation is not governed or affected by UCC filing requirements. *See First State Bank v. Reorganized Sch. Dist. R-3, Bunker,* 495 S.W.2d 471, 477 (Mo. App. 1973). Therefore, the Court turns to the equitable subrogation issue.

### 2. Equitable subrogation

"Subrogation is a right by which the equity of one person is worked out through the legal rights of another. The right of subrogation accrues to a person who has paid the debt or obligation for which another is primarily responsible." *Jos. A. Bank Clothiers, Inc. v. Brodsky*, 950 S.W.2d 297, 302 (Mo. App. 1997) (citation omitted). "Subrogation should be applied where justice, based on the dictates of equity and good conscience, demands its application, and where the rights of the one asking subrogation are more equitable in nature than those who oppose the subrogation." *Id.* (citing *In re Jamison's Estate,* 202 S.W.2d 879, 883–84 (Mo. 1947)). *See also Keisker v. Farmer,* 90 S.W.3d 71, 75 (Mo. 2002) ("Subrogation exists to prevent unjust

enrichment."). "'Determination of whether a party has a right to equitable subrogation depends on the facts of the case.'" *Scottsdale Ins. Co. v. Addison Ins. Co.*, 448 S.W.3d 818, 831 (Mo. 2014) (quoting *Ethridge v. TierOne Bank,* 226 S.W.3d 127, 134 (Mo. 2007)).

Berkley argues that "[w]hen a surety executes a bond on a construction contract, and then is required to pay unpaid labor and materials, or to complete the contract, the surety has an equitable right of subrogation or equitable lien on funds retained by the owner or obligee." Doc. 43, p. 8 of 21 (citing *First State Bank,* 495 S.W.2d at 480-81). Berkley continues: "That right of equitable subrogation is superior to one who takes by assignment after the date of the bond's execution because, *inter alia,* the subrogation right relates back to the date of the surety's bond." *Id.* (citing *First State Bank*). Berkley argues that here, the Indemnitors "defaulted in paying their subcontractors and suppliers on May 20, 2013" and that it (Berkley) fulfilled its bond obligations by spending over $2.5 million to complete the bonded projects and pay subcontractors and suppliers. *Id.*, p. 9 of 21. Therefore, Berkley concludes, its "right of subrogation relates back to the date of the bond[,]" *id.*, which is prior to the date of January 20, 2015.

Berkley's argument fails for at least two reasons. First, the right of equitable subrogation generally only arises "upon total satisfaction of the underlying obligation." RESTATEMENT (THIRD) OF SURETYSHIP & GUARANTY § 27 (1996); *American Surety Co. of New York v. Westinghouse Elec. Mfg. Co.,* 296 U.S. 133, 137 (1935) (holding that a prerequisite to equitable subrogation is the surety's full satisfaction of any underlying debt or obligation); and *Pennsylvania Nat'l Mut. Cas. Ins. Co. v. City of Pine Bluff,* 354 F.3d 945, 951 (8th Cir. 2004) (citing RESTATEMENT (THIRD) OF SURETYSHIP & GUARANTY § 27 cmt. b). As the Supreme Court acknowledged in *American Surety,* full satisfaction is necessary. Otherwise, "the surety would reduce the protection of the bond to the extent of its dividend in the assets of the debtor." 296

7

U.S. at 137. Similarly, under Missouri law, "[t]he surety's right to be subrogated remain[s] only potential until it satisfie[s] an obligation it was required to satisfy." *First State Bank*, 495 S.W.2d at 480. The question of *when* the right of equitable subrogation arises is important, because the doctrine does not apply to progress payments already paid. *See Capitol Indem. Corp. v. Citizens Nat. Bank of Fort Scott, N.A.*, 8 S.W.3d 893, 901 (Mo. App. 2000) (surety must show "it paid labor and materials claim *prior to the city's payments of progress payments*") (emphasis added)); and *First State Bank*, 495 S.W.2d at 481 (the "right of subrogation . . . [that] relates back to the date of the surety's bond" extends to "earned *but unpaid* progress payments . . . in the hands of the contractee at the time of default") (emphasis added)). *See also Int'l Fid. Ins. Co. v. U.S.*, 949 F.2d 1042, 1046 (8th Cir. 1991) ("when sums earned under the contract are paid generally to the contractor, such funds are thereby freed of any equity or right of subrogation in the surety").

Here, it is unclear precisely when Berkley satisfied any underlying obligations in total. But the evidence shows that January 16, 2015 was the date that the last progress payment from any of the 20 project owners was deposited into a JCI direct deposit account or applied to JCI loan obligations, and that Berkley did not make its first payment on a JCI contract until February 10, 2015. Berkley's right to subrogation remained only potential until at least February 10, 2015 and no progress payments were deposited in Hawthorn Bank or set off by it thereafter. Equitable subrogation therefore does not establish Hawthorn's right of possession in the progress payments applied by Hawthorn, for purposes of the conversion claim.

Berkley cites *First State Bank*, 495 S.W.2d at 479-80, 484, in support of its argument that its right to be equitably subrogated dated back to the date of the bond, and that it does not matter when progress payments were made, only that JCI failed to timely pay a subcontractor or supplier. *See* Doc. 43, p. 9 of 21. However, the Missouri Court of Appeals rejected the same,

8

*First State Bank*-based arguments in *Capitol Indemnity*:

> *First State Bank* does say that when a contractor becomes "in default as a matter of fact" and the surety becomes obligated to pay under the terms of its bond, that "the surety's right of subrogation relates back to the date of the execution of the bond." [495 S.W.2d] at 481. However, this right extends only as to amounts which are unpaid. *Id.* The Missouri Supreme Court has said that an equitable lien may attach to progress payments earned or retained percentages agreed to under the terms of the contract, but only as to sums that are *unpaid* and in the hands of the contractee or placed under the control or joint control of the surety. *National Surety Corporation v. Fisher,* 317 S.W.2d 334, 342 (Mo. banc 1958).
>
> Generally, money paid unconditionally to a contractor for work done under the contract becomes his "to do with as he pleases" and is "freed of any equity or right of subrogation in the surety." *Id.* at 345. Capitol Indemnity makes no allegation, nor presents any evidence, that ESI was obligated under its construction contract with the city to use the payments it received from the city only to pay the labor and materials claims on the project.
>
> In this instance, Capitol Indemnity seeks to retroactively recover sums which may or may not have been paid out by the city prior to the alleged default of ESI in paying its labor and materials claims on the project. One of the primary difficulties with Capitol Indemnity's allegation of conversion, is that it fails to state an exact date when it became entitled to any progress payments paid to ESI by the city. Capitol Indemnity alleges generally, that ESI was "in default as a matter of fact" when the bank had difficulty collecting on its business loan to ESI. However, Capitol Indemnity did not become entitled to rights to *earned, but unpaid progress payments,* until it became obligated to and did pay labor and materials claims on the construction project. *First State Bank,* 495 S.W.2d at 480.
>
> Because Capitol Indemnity did not plead or prove by affidavit that it paid labor and materials claims prior to the city's payment of progress payments on January 7, and February 4, 1998, Capitol Indemnity has failed to support its claim of a right of subrogation to the payments.[] Thus, it cannot be inferred as a matter of law that Capitol Indemnity had a right to possession of the payments at the alleged time of conversion, and its cause of action fails.[].

8 S.W.3d at 900–01 (emphasis in original). In short, *Capitol Indemnity* distinguishes *First Bank*, and reinforces the rule that a surety's rights depend on whether surety had become obligated to pay, and did pay, labor and material claims on the project, and if it had, then the surety would

become entitled only to sums that were unpaid and in the hands of the contractee or under the control or joint control of the surety. The *Capitol Indemnity* court did not hold that a surety could claw back funds already paid.

Berkley also relies on *Int'l Fid. Ins. Co. v. U.S.,* 949 F.2d 1042, 1046 (8th Cir. 1991), and *Mass. Bonding & Ins. Co. v. Ripley County Bank,* 237 S.W. 182, 195 (Mo. App. 1921). *See* Doc. 43, pp. 9-10 of 21. The cases are inapplicable and do not change the analysis. Berkley states, quoting from *International Fidelity,* 949 F.3d at 1046, that "'[i]f the default occurred before the progress payment was due, then the surety was entitled to the progress payment.'" Doc. 43, p. 9 of 21. However, the Eighth Circuit was not addressing progress payments already paid, but retainages and when a surety's interest in earned, undisbursed, progress payments would arise, as determined by the date of default. 949 F.2d at 1046. The Eighth Circuit then considered whether 26 U.S.C. § 6323(c), which governs priority of tax liens, gave a surety's claim to progress payments priority over the IRS' tax levy, an issue controlled by the timing of the filing of the IRS' tax lien and the contractor's date of default. The Eighth Circuit did not hold that upon a contractor's default, a surety was entitled to claw back funds already paid to a contractor. The Eighth Circuit in fact acknowledged "Missouri['s] general rule that 'when sums earned under the contract are paid generally to the contractor, such funds are thereby freed of any equity or right of subrogation in the surety.'" *Id.* (quoting *Fisher*, 317 S.W.2d at 345)). Section 6323(c), however, "[enables] claimants to bring wrongful-levy actions against the government," and the Eighth Circuit held that it would not eliminate that statutory right by holding that the IRS' levy had "[brought] the funds within the constructive possession of the government[.]" *Id.*, 949 F.2d at 1047, n.3. Neither § 6323(c) nor any analogous statute applies here.

*Massachusetts Bonding*, 237 S.W. 182, is also unpersuasive, because it pertains to monies reserved under a contract as security. In that case, a contractor had a building contract

with a school. The contract required some funds due the contractor to be held back by the school. The contractor defaulted in the payment of various claims against the job and the surety for the project paid these claims. At some point, the school board paid a part of the retained funds to a bank which had loaned money to the contractor. The contractor had assigned his interest in the retainage to the bank  The surety sued the bank, and successfully recovered on the theory of a superior right by subrogation "in and to the funds which by the contract were required to be reserved as security for the payment of unpaid bills[.]" *Id.*, at 185 (citing *Hardaway v. Nat. Sec. Co.,* 211 U.S. 552 (1909), *Henningsen v. U.S. Fidelity & Guar. Co.,* 208 U.S. 404 (1908), and *Prairie State Bank v. United States,* 164 U.S. 227 (1896)[3]). In *Massachusetts Bonding,* there was no question of a deposit by the contractor being used by the bank to satisfy a debt obligation.

The Missouri Supreme Court subsequently explained the outcome in *Massachusetts Bonding* as follows: "Since the suit involved a percentage expressly required to be reserved under the contract as security, the [Court of Appeals] seems to have considered the payment to the bank as wrongful and, therefore, to be disregarded." *Fisher,* 317 S.W.2d at 343–44. The Court of Appeals likewise distinguished *Massachusetts Bonding* as a case "that did not involve payments made to contractors, but reserved percentages retained under the construction contract," and as having "no application to money not reserved as a security but paid over to the contractor." *Audrain City ex rel. and to the Use of First Nat. Bank of Mexico v. Walker,* 155 S.W.2d 251, 261 (Mo. App. 1941). Retainages are not at issue here, and *Massachusetts Bonding* therefore does not change the analysis.

As discussed above, equitable subrogation does not establish Berkley's right to possession for purposes of its conversion claim.

---

[3] Similar to the *Massachusetts Bonding* case, the *Hardaway, Henningsen*, and *Prairie State Bank* cases involved retained funds.

### 3. Trust funds

Berkley alleges that in addition to being entitled to possess the progress payments as an equitable subrogee, it was entitled to possess them as a trust beneficiary. The allegation fails.

The General Agreement of Indemnity, executed by Berkley and the Indemnitors, states:

> ARTICLE VI—TRUST FUND
>
> The Indemnitors agree and hereby expressly declare that all funds due or to become due under any Contract covered by a Bond are Trust Funds, whether in the possession of an Indemnitor or another, for the benefit and payment of all persons to whom the Indemnitor incurs obligations in the performance of a Contract for which the Surety would be liable under the Bond and for the benefit of Surety for any liability or loss it may sustain or incur by reason of or in consequence of the execution of such Bonds. Upon notice from the Surety to an Obligee, Indemnitors hereby authorize and direct the Obligee of any such Bond to pay to the Surety any and all Funds due or to become due on any Contract bonded by Surety, and upon payment of such funds the Obligee is released and discharged from any and all liability to Indemnitors in connection with the payments.

Doc. 43, p. 4 of 14. The Agreement further provides that it is governed by New York law. *Id.,* p. 6 of 14 (Article XX—General Provisions, section 20.03). Hawthorn Bank was not a party to the Agreement.

The parties vigorously dispute whether New York law establishes a valid trust under the circumstances. Assuming, without deciding, that the Agreement did establish a trust, Hawthorn's set-off did not constitute conversion because the undisputed evidence shows that Hawthorn did not have notice that the funds were trust funds until January 20, 2015.

Missouri law does not provide for the unwinding of a bank's set-off based on a trust theory, absent evidence that the depositor intended to create a trust or special deposit subject to use for a specific purpose, or that the bank understood the depositor intended to do so. *See Killoren v. First Nat. Bank in St. Louis*, 127 F.2d 537, 542 (8th Cir. 1942). In *Killoren*, the Commercial Factors Corporation was financing the Hamilton-Brown Shoe Company by making

loans to it against the pledge of its accounts receivable. Shoe Company from time to time deposited funds that it received from Commercial Factors, into its accounts at First National Bank. At some point, there was a conversation between representatives of Commercial Factors and the Bank about whether Shoe Company would meet its payroll, but there was no agreement between any of them that any part of the funds deposited by Shoe Company would be treated as a special deposit. 127 F.2d at 539-40. The Bank subsequently applied a $19,000 deposit made by Shoe Company to reduce the amount Shoe Company owed it. When Shoe Company went bankrupt, the bankruptcy trustee sought to impress a trust on the funds, but the Eighth Circuit affirmed the trial court's dismissal. The Eighth Circuit held that in making the deposit, Shoe Company "did … not indicate an intention to create a trust or a special deposit subject to use for a specific purpose, [and] the evidence show[ed] the bank did not understand that [Shoe Company] intended to do so, or … intended to enter into a special relationship" when the deposit was made. *Id.* at 542. *See also Landwher v. Moberly,* 93 S.W.2d 935 (Mo. 1936) (Div. 1) (holding that for a deposit in a bank to be regarded to have been made for a special purpose, "that purpose must be evidenced by a mutual understanding or agreement on the part of the depositor and the bank and the intention or purpose, merely on the part of the depositor, that it should become a special deposit is not sufficient to make it so."); and *Central Coal 7 Coke Co. v. State Bank,* 44 S.W.2d 188, 191 (Mo. App. 1931) (special deposit was established where there was written direction and verbal agreement between the parties that deposits made in a certain manner should be used for the specific purpose of meeting pay roll checks which were written at the time of the deposits, the testimony of both plaintiff and defendant showed this understanding, and it was followed in practice for a period of about six years).

Similarly here, there is no evidence that Hawthorn knew about the trust fund provisions of the Indemnity Agreement any earlier than January 20, 2015 when Berkley sent it a copy.

Even if, as Berkley states, Hawthorn knew JCI was in financial difficulty, no duty was imposed upon Hawthorn to inquire into JCI's conduct in order to protect others with whom the bank was not in privity. *See U.S. Fid. & Guar. Co. v. Mississippi Valley Trust Co.*, 153 S.W.2d 752, 759 (Mo. App. 1941) (stating that in the absence of notice to the contrary, a bank may assume a customer-trustee will appropriate trust monies to the proper use; "[t]he mere fact … that a bank knows that moneys deposited with it have by a [customer] been acquired in a fiduciary capacity does not impose on it the duty, or give it the right, to institute an inquiry into the conduct of its customer in order to protect those for whom he may hold the fund, but between whom [they] and the bank there is no privity"). The Eighth Circuit also acknowledged in *Killoren* that Missouri "has not adopted [the] so-called equitable rule," which is a minority rule that bars a bank from making a set-off even when it does not know that funds are held in trust. 127 F.2d at 542.

Hawthorn is entitled to summary judgment on Count I.

### C. Count II, Tortious Interference with Business Expectancy

To establish a claim for tortious interference, a plaintiff must prove: (1) a contract or valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) a breach induced or caused by defendant's intentional interference; (4) absence of justification; and (5) damages. *Rice v. Hodapp*, 919 S.W.2d 240, 245 (Mo. 1996). A plaintiff who "fails to establish substantial evidence of any one element" has failed to meet its burden of proof for the claim. *Hibbs v. Berger*, 430 S.W.3d 296, 318 (Mo. App. 2014). Berkley cannot meet its burden with respect to the second element because Hawthorn did not have knowledge of the Indemnity Agreement until January 20, 2015, after the last progress payment was applied to a loan.

Hawthorn is entitled to summary judgment on Count II.

### C. Count III, Equitable Lien

Berkley alleges that under the terms of the Bonds and Indemnity Agreement, the

express intent was for all funds paid on JCI's projects bonded by Berkley to serve as security for payment of Berkley, completion of the projects, and payment of subcontractors and suppliers. Doc. 11, p. 22. Berkley alleges that "[f]rom the moment Berkley executed the Bonds in favor of JCI, [Berkley] acted as JCI's surety and held an equitable lien on the Bonded Projects and trust funds." *Id.*

The requirements for establishing an equitable lien are: "1) a duty or an obligation owing by one person to another; 2) a *res* to which that obligation fastens, which can be identified or described with reasonable certainty; and 3) an intent, express or implied, that the property serve as security for the payment of the debt or obligation." *Ethridge v. TierOne Bank*, 226 S.W.3d 127, 134 (Mo. 2007) (internal quotation and citation omitted). In *Ethridge*, a bank sought an equitable lien on property against a widow who possessed the property. Some years earlier, her husband had refinanced the property, which they owned as tenants by the entirety, but she had not signed an agreement that purported to grant the bank an interest in the property. *Id.* at 129-30. The Missouri Supreme Court held that the bank's equitable lien "argument fails for the simple reason that [the widow] did not owe an obligation to the [bank]. She did not sign the promissory note. Since [she] did not owe an obligation, the first essential element for equitable estoppel [was] not present." *Id.*

Berkley's equitable lien claim fails for the same reason the claim failed in *Ethridge*. The basis for Berkley's claim is the contractual arrangement between Berkley and the Indemnitors, to which Hawthorn was not a party. Hawthorn simply did not owe a duty or obligation to Berkley. *See also Hartford Fire Ins. Co. v. Columbia State Bank*, 334 P.3d 87, 93-94 (Wash. App. 2014) (no equitable lien claim against bank where progress payment made before surety paid any claim); *Acuity Mut. Ins. Co. v. Planters Bank, Inc.*, 362 F.Supp.2d 885, 894-95 (W.D. Ky. 2005) (noting that surety has no equitable lien or equitable subrogation claims

for "already paid, not retained contract proceeds" that were applied to contractor's bank loans).

Hawthorn is entitled to summary judgment on Count III.

### D. Count IV, Constructive Trust

Hawthorn argues it is entitled to summary judgment on Count IV because "'constructive trust' is not a cause of action, but rather a remedy." *Neher v. eBanker USA.Com, Inc.,* 2005 WL 1006417, at *6 (W.D. Mo. Apr. 1, 2005) (citing *Fix v. Fix,* 847 S.W.2d 762, 765 (Mo. 1993)); *see also Secure Energy, Inc. v. Coal Synthetics, LLC,* 2010 WL 1691184, at *3 (E.D. Mo. Apr. 27, 2010) (granting summary judgment on grounds that constructive trust is a remedy and not an independent cause of action). Berkley concedes that constructive trust is not an independent cause of action, and instead is derivative of its other substantive claims to some right of possession or ownership. Doc. 43, p. 18 of 21. Count IV therefore fails.

### E. Count V, Implied Indemnity

Berkley seeks to recover under a theory of implied, or non-contractual, indemnity. To prove such a claim, a plaintiff must show:

- the discharge of an obligation by the plaintiff;
- that the obligation discharged by the plaintiff is identical to an obligation owed by the defendant; and
- that the discharge of the obligation by the plaintiff is under such circumstances that the obligation should have been discharged by the defendant, and defendant will be unjustly enriched if the defendant does not reimburse the plaintiff to the extent that the defendant's liability has been discharged.

*Beeler v. Martin,* 306 S.W.3d 108, 111 (Mo. App. 2010) (citing 35 MISSOURI PRACTICE: CONTRACTS, EQUITY, AND STATUTORY ACTIONS HANDBOOK § 41:2 (2009)).

Under the second prong, duties are not identical or coextensive when "the underlying bases" for the duties differ. *Global Petromarine v. G.T. Sales & Mfg., Inc.,* 577 F.3d 839, 846 (8th Cir. 2009) (quoting *State ex rel. Manchester Ins. & Indem. Co. v. Moss,* 522 S.W.2d 772,

774 (Mo. 1975)). In *State ex rel. Manchester,* an insurer intervened in an action brought by its insured motorist against an uninsured motorist defendant. The insurer cross-claimed against the defendant motorist for indemnity. The insurer asserted that if the uninsured defendant's negligence was found to be the cause of the plaintiff's injuries, then defendant should indemnify insurer, who would be required to pay the plaintiff on its contract of insurance. The trial court dismissed the insurer's cross-claim and the insurer filed a petition for writ of prohibition. The Missouri Supreme Court held that the trial court properly dismissed the cross-claim. The Missouri Supreme Court acknowledged that although the defendant motorist's negligence may have precipitated the insurer's liability to the insured plaintiff, the insurer's payments to the insured were "separate and distinct from the obligations owed by an uninsured defendant." 522 S.W.2d at 775. The insurer's obligation to the plaintiff arose out of its contract of insurance with the plaintiff and thus was not co-extensive with the duty owed to plaintiff by the uninsured defendant, which arose out of the latter's negligence. The court held that the doctrine of implied indemnity was inapplicable because the insurer's duty to the plaintiff was not identical to the defendant driver's duty to the plaintiff. *Id.* at 775.

In *Merchants Bonding Co. v. Noland*, 2010 WL 3584017, at *1 (W.D. Mo. Sept. 7, 2010), Plaintiff Merchants Bonding alleged that the Defendants, as the attorneys for the conservator of an Estate, were liable to the Estate for professional legal negligence and that Defendants' legal malpractice caused Merchants Bonding to pay the Estate $200,000.00 on its surety bond and incur significant attorney fees, costs, and expenses. Merchants Bonding sought to recover the $200,000.00 from Defendants under an implied indemnity theory. The Court dismissed the claim, because Merchants Bonding's duties were not identical to the Defendants' duties. The Court held that even if the Defendants' alleged professional legal negligence had triggered Merchants Bonding's liability on behalf of the conservator, any payment under the

surety contract would not in any way discharge Defendants' duty of care to their client. Because Merchants Bonding and Defendants' duties did not share the same underlying bases, the claim for implied indemnity failed. *Id.* at *2.

Here, too, Berkley's obligations were not identical to or coextensive with Hawthorn's obligations. Berkley's obligations with respect to JCI arose from Berkley's issuance of the payment and performance bonds for JCI's construction projects. Hawthorn had no obligation to pay or perform with respect to JCI's construction contracts. Even if Hawthorn's actions in setting off the progress payments to satisfy JCI's loan debts to Hawthorn effectively resulted in Berkley paying out more than it otherwise would have on its bond obligations, Berkley's payments would not discharge any obligation running between Hawthorn and JCI.

Hawthorn is entitled to summary judgment on Count V.

### F. Count VI, Unjust Enrichment

Berkley's final claim is for unjust enrichment. Specifically, Berkley alleges that it conferred a benefit on Hawthorn by paying JCI's subcontractors, suppliers, and project owners so that those entities did not make demands on Hawthorn for JCI's funds which were in the nature of trust funds. Doc. 1, pp. 25-26 of 27. Berkley further alleges that Hawthorn recognized the benefit conferred on it by Berkley, did not pay value for the benefit despite Berkley's demands, and was enriched at Berkley's expense, and that allowing Hawthorn to retain the benefit conferred on it by the "taking of the … trust funds of Berkley" would be unjust. *Id.* at p. 26 of 27.

An unjust enrichment claim requires a plaintiff to prove that (1) it conferred a benefit on the defendant, (2) the defendant appreciated the benefit, and (3) the defendant accepted and retained the benefit under inequitable or unjust circumstances. *Howard v. Turnbull,* 316 S.W.3d 431, 436 (Mo. App. 2010) (citation omitted). Further, even if a benefit is conferred and

appreciated, if no injustice results from the retention of the benefit, then no cause of action for unjust enrichment will lie. *Id.* "Mere receipt of benefits is not enough when there is no showing that it would be unjust for defendant to retain the benefit received." *Farmers New World Life Ins. Co. v. Jolley,* 747 S.W.2d 704, 706 (Mo. App. 1988). *See also Inauen Packaging Equip. Corp. v. Integrated Indus. Servs., Inc.*, 970 S.W.2d 360, 366 (Mo. App. 1998) ("[T]he focus is not on the loss sustained by the plaintiff but on the benefit conferred upon the defendant for which it would be inequitable for him to retain.").

Berkley did not confer a benefit on Hawthorn. The evidence does not show that Hawthorn was liable for covering JCI's losses or paying subcontractors, suppliers, or project owners. Nor does the evidence show that the subcontractors, suppliers, or project owners could have recovered, or at any point sought to recover, trust funds from Hawthorn.

However, even if Berkley did confer a benefit on Hawthorn, the retention of the benefit was not unjust. The evidence does not show that Berkley paid the subcontractors, suppliers, or project owners to protect Hawthorn from claims; that Berkley made such a representation to Hawthorn; or that Hawthorn agreed to compensate Berkley for such benefit. Rather, Berkley, as surety, was obligated to pay the subcontractors, suppliers, and project owners pursuant to its contract with JCI, and did so. If Hawthorn benefited from Berkley's payments, it did so passively. Where a benefit was retained by a passive beneficiary, unjust enrichment will not lie. *Hunt v. Estate of Hunt,* 348 S.W.3d 103, 112 (Mo. App. 2011).

Berkley cites *Fed. Ins. Co. v. Fifth Third Bank,* 867 F.2d 330 (6th Cir. 1989). Doc. 43, p. 20. The case is inapplicable because it applies the minority rule under which a bank's knowledge of the trust fund nature of funds may be implied. As discussed, above, Missouri follows the contrary, majority rule. *Killoren,* 127 F.2d at 542. Berkley's remaining citations do

not persuade the Court that an unjust result has been reached under the circumstances presented here.

Hawthorn is entitled to summary judgment on Count VI.

### III. Conclusion

Defendant Hawthorn Bank's motion for summary judgment, Doc. 38, is granted.

s/ Nanette K. Laughrey<br>
NANETTE K. LAUGHREY<br>
United States District Judge

Dated:  September 29, 2017
Jefferson City, Missouri